May it please the Court, my name is Gail Ivins. I'm here this morning representing the defendant appellant Trayvon Mitchell. Your Honor, I would ask that the Court save itself a lot of trouble and reverse on the issue of the District Court's refusal to allow the defendant to fire his retained counsel before trial. Then we'd reverse and remand for a new trial and we don't have to address the Blakeley issues or any of the other issues that this case raises. Well, there's a heavy burden here. This motion was made the morning of trial and it didn't look like communications had broken down. It didn't look like the counsel had not prepared the case. He'd been quite diligent, apparently. So is it an abuse of discretion at that point for the District Court to refuse to substitute counsel? Mr. Mitchell didn't say who he wanted or that he would be prepared in two days to go ahead with the case. The District Court judge did not ask those questions, Your Honor. And that the real problem The reason I have an argument, the reason that the issue is in the brief, is because this was a retained counsel situation, not appointed counsel situation. We have no evidence based on any type of inquiry by Judge Keller as to the impact of any delay on either the parties, although we do know that Mr. Rose, who was in pro se at that point, had also asked for a continuance. So we're going to assume that he was fine with that. So we have a co-defendant apparently is fine with that. We have no inquiry by the District Court and no evidence as to the impact any delay would have had on the government counsel, on the government witnesses. The evidence we do have about any problems with delay is that we have FBI agents, government agents, and in-town bank employees. These banks were in, you know, Crenshaw, Downey, I mean, very local to the downtown Los Angeles area. But we have 75 jurors in the wings. Well, Your Honor, I practiced in district court for a very long time. And that is a problem. And it certainly is a factor. The Court had set aside that day, September 30th, for hearing pretrial motions. The Court was able to accommodate the co-defendant, Mr. Brown, who came in to change his plea that morning. And that's what they did all morning. Mr. Rose had a motion on calendar to continue the trial. The jurors were certainly, quote, unquote, waiting in the wings. But that is the only evidence we have. And that is an issue of court congestion and the Court's schedule. It's an important issue, but it's one that is not often actually discussed in this Court's jurisprudence when it comes to the issue of the impact of the delay. I believe actually Judge Tashima wrote for the dissent in one case, which then sort of pointed out that, you know, we also should worry about the impact on the district court. And that certainly is a factor. But it is not a determinative factor. The Sixth Amendment still — Do you think it would have made a difference if Mr. Mitchell would have said, well, you know, I've contacted another lawyer. I'm not sure when he can be ready. But I've made — you know, I've spoken to another lawyer, and I'm going to retain him. You know, I need to continue in order to do that, Judge. And we don't know. I mean, he — He didn't say that. He just said, I want to — you know, I want to continue. This guy's not doing what I think he should be doing. And those are the — That's about it. And as Judge Fletcher said, there was no — you read it, and it doesn't appear, though, there was a breakdown in communication. That's true, Your Honor. There is a clear disagreement. There's a conflict about trial strategy. That's really the most I can say based on this record. There's a conflict between the defendant and his lawyer about their trial strategy, their pretrial strategy. The — He really didn't — you know, we're all guided by our experience, and you're a very experienced lawyer in these matters. Judge Keller was a very — is a very experienced judge. I don't know that he has to dot every I and cross every T when he sizes up a situation. My own experience, which is fairly limited as a trial judge, is that even in that rather short space, I've had a couple defendants who at the last moment, about to face a trial, and, oh, I want to change my lawyer. It's — I have to think it's a phenomenon that occurs when you're suddenly faced with the — you're actually going to trial, and you'd rather not. And you invoke the Sixth Amendment, but it's a feeble read if you don't have some alternative to propose. And sure, it would save us trouble, but I think it would cause the government to have a new trial because this man has this sudden climb. I wonder. Your Honor, this is somewhat similar in terms of district court and what judges are expected to do. This is somewhat similar to the situation when the defendant shows up a day or two before the trial and says, I want to be my own attorney. I mean, at that point, the district court has certain obligations, and under this court's jurisprudence, it's obligation in our situation when they say, I want to get rid of my retained counsel, not substitute appointed counsel. I want to get rid of my retained counsel. The court's obligation is to conduct an adequate inquiry, and an important part of that inquiry in terms of balancing against the Sixth Amendment is the impact of the delay. How long do you think it would have taken to find counsel and have counsel prepare the case? Either he had already contacted counsel, and if he had, it would still have taken several weeks. I think that's reasonable. I mean, unless someone had already read all of the pretrial material. Or there is the possibility that he would have opted to go pro se once Judge Keller had done an adequate inquiry and explained to him the facts of life, which is, I'm not going to give you two months. You can have a week. What do you want to do if you have a week? I mean, I've been there for these conversations. And he says, you know what, my co-defendant's pro se, I'll be pro se, too, which would have been an unfortunate outcome, I believe, for everyone in the courtroom, except for maybe the defendants, since Mr. Rose, when he was pro se, did a much better job on his verdict, despite stronger evidence, than my client did with counsel. So it might have been a good thing for my client to have gone pro se. But that is another option that we didn't have the exploration by the district court about. Well, there was no suggestion that he wanted to go pro se. No, there was none, except, I'm just saying, a client who comes in, and they're always my clients, you know, who comes in and says, I want a new lawyer, or I don't want this lawyer, I want to fire him. And if the judge said, well, okay, so are you ready? You know, do you have somebody else ready to step in? What's his name? I mean, that was an appropriate question. What's his name? What's his phone number? Can he be here? Can he or she be here, you know, today? I want them in court at 3 o'clock. And then that lawyer comes in and does their normal, I need two months, judge, and he goes, you can't have two months. If you can be ready, you know, by Friday, I'll let you sub, you know, I'll let you substitute as retained counsel. Lawyer says, I can't be ready by Friday. It would be ineffective assistance. And Judge Keller says, well, then I won't let you. Now what do you want to do, Mr. Mitchell? And I'm just saying, having seen it happen, there are times when the defendant would say, well, then I'll just represent myself, Your Honor. And then we'd have a forensic inquiry. And then we might have had a different kind of trial. But we could move on to some of my other issues, although I do think that there is an insufficient inquiry on the impact of the delay. The verdict in this case, to say the least, was somewhat unusual. I have to agree with Judge Keller that he totaled up everyone's experience at 100 years. I'll add my 20. I haven't seen a verdict like that. I don't know if any of Your Honors have. And I think that that fact, the fact that the way that the panel members, the jury panel members had voted was disclosed on the jury panel, I think that at that point the district court should have, you know, taken the verdict that he did take. We don't challenge those three guilty verdicts. And been a little more careful in what he said to the jury. He didn't know who was voting, how the jury split. Which members of the jury were for not guilty. And then if you look at the way they recorded their votes, it's all over the place. On one count it was a four guilty, eight for guilty, four for not guilty. Then it was three guilty, nine not guilty. Then it was nine guilty and three not guilty. And I think had there been verdicts of not guilty, 12, had there been a lot of 12s, say an even number, four 12s for not guilty and four 12s for guilty, we'd be a lot closer to the Adjuboy decision by this court where we had a 9-3 and a 3-9. I think that the distinction in our case is that the only verdicts were guilty verdicts and the judge made a lot of, you know, I think unfortunate or, you know, not, but comments about just and fair and proper verdicts, the only verdicts were guilty. The only one more verdict that's in dispute here. Yes, Your Honor. The 924C count, count 12. That is the additional verdict. It's five years of my client's life or more, depending on. What happens with Blakely. That did affect the sentence by five years? Well, right now the sentence imposed on my client relies on the note on the, you know, the guidelines that says you can have an upward departure if 60 additional months for the gun count isn't enough because if you had imposed the points on the robbery guideline, you would have gotten more than 60 months, then you should have an upward departure to account for that. So right now, today, my client's sentence because of the conduct for which he was convicted on count 12 is more than the 60 months. So the answer to that question depends on so many factors. But at a minimum, there is sort of this five years or the guideline provisions in play. And depending on Booker and Fanfan and everything else, it may be at least a full five years that that reversal on this would save him. Now, the judge quite wisely refused to poll the jury at that point. That was a smart move on his part. So nobody knows who was where on anything. And he didn't give an Allen charge then. He declined the government's request. That's true. And if he had, you know, not said much and then given his later jury instruction, I don't have a quarrel with the jury instruction. My quarrel is with his statements when he sent them home talking about their just and fair, proper verdicts. And that even though he did not inquire into the numerical division, he was aware of the numerical division. And he said, you know, we can make a decision with just 11 jurors. And I think in a case where we have one vote standing between my client and a guilty verdict, that was a problematic statement, too, that we could make a decision with just 11. I don't know what we're going to do with all of you, but let me think about it and talk to the lawyers, and we'll see you tomorrow. Unless the Court has further questions, I would like to save the balance of my time for rebuttal. Okay. Mr. Hofstadt. Good morning, Your Honors. May it please the Court, Brian Hofstadt for the United States. I just wanted to respond initially to the two points raised by defense counsel of the challenges to the conviction. With respect to the courts, the district court did not abuse its discretion in this case in denying the morning of trial request for continuance. In this case, I mean, most of the Sixth Amendment cases that are cited by defendant, Wheat, Lilly, all these decisions talk about the qualified right to retain counsel. The government reads those cases differently than defense does. I mean, those cases all seem to deal with a situation where a defendant has either appointed or retained counsel and has other retained counsel that he or she wishes to have appointed. In this case, the defendant has the retained counsel, at least up until that point, that he wanted, and there's no indication of what he wants next. And when he eventually got new counsel, it was appointed counsel that was after the point of trial. So I'm not sure that those cases have the force that they do in the retained counsel situation in this particular case. In this case, the district court did conduct a thorough inquiry as to why the defendant wanted new counsel, asking the defendant no fewer than seven times, what are your bases? And he addressed each of these bases with the defendant at that time. The court also examined whether there was a breakdown in communication. And based on what the defendant's concerns were, what defense counsel said when he asked, you know, do you agree that there's no breakdown, and what the court actually observed in court, he found that there was no breakdown. Defendant seems to have, seems to advance the rule that there has to be some sort of finding on the record regarding the need for a continuance, an inquiry into the extent of delay that would be occasioned. While the government would submit that the record did contain ample evidence of the fact that this was going to be a three- or four-week trial, that there were 30 or 40 government witnesses, that there were the witnesses, the jurors waiting in the wings, this Court in both the Garcia case and the Smith case that we cited, on its own, from the position of being the court of appeal, said that, you know, there would likely have been that a continuance would have been necessary. This Court surmised for itself that a continuance would have been necessary. Moreover, in other decisions that this Court has handed down on this particular issue, it has looked at the need for a continuance and the delay that would be occasioned as one of the three factors among the three that the Court looks at. And so the absence of factors in this particular case is not, in the government's view, fatal to what the district court did and did not rise to the level of abuse of discretion. Turning to the issue about whether the verdict was coerced, I think everyone here would agree that Judge Keller and the counsel in that case were quite surprised when they thought they had a verdict form and ended up having the numerical breakdown. And the government believes that the district court did everything it could in a very difficult situation not to coerce a verdict on count 12. The court, in fact, explicitly noted that its primary concern was not to coerce any sort of verdict. And it's important to keep in mind that prior to the time that count 12 was handed down by the jury, that there was no Allen charge that was given. The district court's instruction at the very end of the day when he got the verdict where he said, I'm going to send you home and we're going to confer with counsels to figure out what we're going to do, that's one comment that defense counsel pointed out. And at that point, while the district court did say you have certainly worked very fair and proper and just, more importantly here, a just resolution of the case, the court did not say that you've reached fair and just verdicts. It said a fair and just resolution, that you've worked toward it. And the government does not believe that this comment made not as part of any jury charge, not asking any jurors to reconsider their views, does not rise anything close to the level of an Allen charge or is otherwise coercive. It was kind of interesting. Once the Allen charge was given, they didn't decide any more cases. They were hung on everything else. Well, that's the government's second view, is that this jury has seemed to have pretty clearly evinced a, shown themselves not to be the kind of jury that's going to respond well to any sort of coercion anyway. Even after the court gave the, this instruction to go home and we'll think about it, and gave the jury the instruction the next day to say, please continue to deliberate, the jury took another full day to deliberate and then came back with only one guilty verdict, ended up, one more guilty verdict, count 12, ended up not reaching guilty verdicts on the rest of those. If you look at what they did with the co-defendant Rose, there were three verdicts there that they were 10-2 at that particular time. And the jury came back as hung verdicts on all of those. They didn't move. And this Court's looked at the fact that if a jury is discriminating and how it is that they come back guilty and not guilty, that's another factor to indicate that this jury was not coerced in any way, shape or form by the district court's comments. Secondly, the other point I wanted to make is the district court's comment about we can decide this on 11 jurors was made after the judge said, okay, I want to, you know, after the judge said, I want to hear from the two jurors who said they have high blood pressure, and so, you know, I want to talk to you one-on-one. He was about to excuse the jury and say, you know, we need to figure out whether or not this health issue is sufficiently serious that we would need to proceed on 11, you know, with 11 jurors. It was not part of any, you know, if you don't come back with a verdict, we're not going to knock one of you off and make you reach a verdict. I mean, when you look at the context of the comments, the Court was very carefully saying, you know, we need to find out what's going on here. He inquired of both of the jurors. Both of them said that they could continue, and all 12 of them went back. And just lastly, this is not a case, anything like Sae Chun or Abitroy, where the district court knew the numerical division and knew who it was who was where they were. I mean, the district court noted and the Court noted here that the verdicts were all over the place. You know, any particular juror had to at least be on a not guilty and a guilty at any particular time. So this is not anything like where the Court inadvertently learns and knows, okay, you're the juror who's holding out, and therefore, my comments are going to be directed at you. And Abitroy made that very clear, that it's when, you know, the Court knows who the juror is and the juror knows the Court knows who the juror is, and that is certainly not the case in this case. And I just wanted to break one other factual thing up to the Court, which is something that I just learned in preparing for this argument. With respect to the claim of the ineffective assistance regarding the failure to consider the extraneous information, that, I mean, the government continues to believe that this, that claim should be delayed and permitted to be pursued in a 2255 where the record can be amply developed. I did, however, notice that the defendant, both Pro Se and his third counsel, both moved in new trial motions on the basis of this extraneous information. And the district court at that point, it's unclear from how it was phrased, but the district court seemed to have either said, the district court basically said that's a 2255 issue, you know, that, you know, you've got something there, that's an issue that's to be developed later. So we know that the district court also, you know, considered that this was at least advanced, though not by his first counsel, by other counsel. So it was something that was at play and that kind of emphasizes the importance and, you know, dovetails into what we put in our briefs about how it is that this should let the district court decide that in the first instance in a 2255. So next. And on the Blakely-Booker-Fan-Fan issues, I gather the government's position is that we should just defer. Yeah. I mean, it appears from the calculations that the defense has put in the supplemental brief that the defendant, even assuming that, you know, under the trend of reading that he's looking at 110 to 137 months plus 60, so 170 months. I think he went into custody in March of 1997. So he served, I think, you know, 85 or 90 months of that sentence. So he's still a far ways off. And so under this court's authority in Castro, we would ask that we hold off. I was checking the blogs this morning. Still nothing. So we're hoping that the Supreme Court will actually decide soon. We'll wait for the court to wait for that resolution. Unless there are any further questions, we'll submit. Thank you. Thank you. Thank you. Very briefly, at 409 of the excerpt of record where the court makes the comment about 11 jurors, it's clear the jury is still in the courtroom, all 12 of them. For the moment, I'm going to ask the 11 jurors to go to the jury room. That would exclude the woman who had the blood pressure problem, not discuss the case. And we will then advise you whether you are going to proceed with 11, which the law permits, or whether we're going to go back to 12, in which case juror number 12 will rejoin you, okay? So that's something the whole jury heard. Also, we don't know that there was no movement. The 10-2 for Rose, the jury finally got the message to not put their division on the jury form. So they just had not guilty. So the 10-2 might have become an 11-1. So there may have been that one juror who was coerced and did move. And finally, on the Blakely issue, this court in Ameline, and I know, Your Honor, you were on that decision, discussed remand and an impanelment of a sentencing jury. And I would, if that issue does become relevant in this case, urge the court to seriously consider the fact that I think a sentencing jury in a case where we've already had a trial would raise serious and perhaps prohibitive double jeopardy problems. I would ask that no sentencing jury be convened on remand. Thank you. Okay. The matter will stand submitted. Thank you very much, Counselor. I appreciate your argument.
judges: B. Fletcher, Noonan, Paez